IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHRISTINE COLEMAN, on behalf of herself )
and all others similarly situated, )
                                                    Plaintiff, )
                                                           )
  vs. )
                                                           )
ALASKA USA FEDERAL CREDIT UNION, )
                                                           )     No. 3:19-cv-0229-HRH
                                  Defendant. )
_____)

O R D E R

Motion to Compel Arbitration

Defendant moves to compel plaintiff to arbitrate her individual claims.[1] This motion is opposed.[2] Oral argument was requested but is not deemed necessary.

Background

Plaintiff is Christine Coleman. Defendant is Alaska USA Federal Credit Union. Plaintiff alleges that she "is an Alaska USA customer. . . ."[3]

---

[1]Docket No. 10.

[2]Docket No. 26.

[3]Class Action Complaint at 2, ¶ 4, Docket No. 1.

Plaintiff alleges that "[o]n November 15, 2018, [she] attempted a small payment to Safeway in the amount of $61.57."[4] Plaintiff alleges that "Alaska USA rejected payment of that item due to insufficient funds in [p]laintiff's account and charged her a $25 NSF Fee for doing so."[5] "Plaintiff does not dispute this initial fee, as it is allowed by Alaska USA's Account Documents."[6] Plaintiff alleges however that without her knowledge and not at her request, "eleven days later, on November 26, 2018, Alaska USA processed the same item yet again, and again rejected the transaction due to insufficient funds and charged [her] another $25 NSF Fee."[7] Plaintiff alleges that she was thus "charged . . . $50 in NSF Fees [in an] attempt to process a single payment."[8] Plaintiff alleges that this breached her agreement with defendant because "Alaska USA's Account Documents state that it will charge $25 per item that is returned due to insufficient funds."[9]

On August 21, 2019, plaintiff commenced this action on behalf of herself and others similarly situated. Plaintiff asserts breach of contract, breach of the implied covenant of

---

[4] Id. at 4, ¶ 18.

[5] Id. at ¶ 19.

[6] Id.

[7] Id. at 4-5, ¶ 20.

[8] Id. at 5, ¶ 21 (emphasis omitted).

[9] Id. at 5, ¶ 26; 8, ¶ 37.

good faith and fair dealing, unjust enrichment, and Unfair Trade Practices Act claims on behalf of herself and others similarly situated.

Defendant now moves to compel plaintiff to arbitrate her individual claims.

Discussion

The Federal Arbitration Act ("FAA") "directs courts to treat arbitration agreements as 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" Blair v. Rent-A-Center, Inc., 928 F.3d 819, 825 (9th Cir. 2019) (quoting 9 U.S.C. § 2)). The FAA "reflect[s] both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract[.]" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citations omitted).

The Account Agreement for individual accounts, such as plaintiff's, provides that

> [c]hanges to the terms and conditions of accounts may occur from time to time and do not require member approval. However, members will be notified of any change, amendment, or modification that would adversely affect them at least thirty (30) days in advance of such change.[10]

In February 2019, defendant changed the Account Agreement by adding an arbitration provision. The arbitration provision states, in relevant part, that

> [t]o the extent allowed by law, all claims or controversies arising between you and the Credit Union shall be subject to arbitration. ARBITRATION IS FINAL AND BINDING ON THE PAR- TIES AND SUBJECT TO ONLY VERY LIMITED REVIEW

---

[10]2018 Share Account Disclosure Statement (Member, Joint, Trust, Fiduciary and Estate Accounts), Exhibit 1 at 2, Declaration of Daniel Tropin [etc.], Docket No. 27.

BY A COURT. IN ARBITRATION THE PARTIES ARE WAIVING THEIR RIGHT TO LITIGATE IN COURT, INCLUDING THEIR RIGHT TO A JURY TRIAL. IF YOU HAVE ANY QUESTIONS ABOUT ARBITRATION, CONSULT AN ATTORNEY OR THE AMERICAN ARBITRATION ASSOCIATION. YOU AGREE AND UNDERSTAND (I) THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY AND (II) THAT YOU AND WE ARE PRECLUDED FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS (THE "CLASS ACTION WAIVER").

ARBITRATION PROVISIONS:

a. Binding Arbitration: At the request of either you or the Credit Union, binding arbitration under the Federal Arbitration Act will be used to resolve any claim or controversy ("Dispute") between or among us and our assigns arising out of or relating in any way to this agreement, this arbitration agreement ("arbitration clause"), or any related agreements or instruments which cover any of your loans, products or services you have or have had in the past with the Credit Union ("Related Documents"). This also includes a Dispute based on or arising from an alleged tort or any alleged statutory or regulatory violation.[11]

"On May 6, 2019, Alaska USA added a 'pop up' notice to the log-in page of the Alaska USA online banking system, which is called UltraBranch."[12]

> The pop up stated: "The Share Account Disclosure Statements have been updated. Please click the applicable link below to review the current terms and conditions." Below that text, the

---

[11] 2019 Share Account Disclosure Statement (Member, Joint, Trust, Fiduciary and Estate Accounts), Exhibit 1 at 13, Declaration of Keith Keller [etc.], Docket No. 11.

[12] Keller Declaration at 2, ¶ 5, Docket No. 11.

> pop up included hyperlinks to the amended Account Agreement. Members were required to close the pop up notification by clicking the "Close" button in order to navigate to their online banking pages.[13]

June Gardner, defendant's Manager of Enterprise Risk and Compliance, testified that defendant decided to use the pop up notice "so that members that did not want to read [the notice] were not inconvenienced by being forced to read it before . . . access[ing] . . . their account online."[14] "According to Alaska USA's records, [plaintiff] navigated to pages on UltraBranch on May 6 and May 8, 2019."[15] Plaintiff avers, however, that she "did not see a pop-up" like the one described above "on UltraBranch in May 2019. . . ."[16] She also avers that she does "not know whether the pop-up blocker feature on [her] Internet Explorer was enabled or disabled in May 2019."[17]

Based on the foregoing, defendant argues that the parties had a valid arbitration agreement and that there can be no dispute that plaintiff's claims fall within the scope of that agreement. Plaintiff, however, disputes whether a valid arbitration agreement exists.

---

[13]Id.

[14]Deposition of June Gardner at 38:3-8, Exhibit 2, Tropin Declaration, Docket No. 27. Gardner testified that there were times when defendant mailed letters to its customers concerning changes to the account agreement, but that it did not do so in this instance. Id. at 22:2-21.

[15]Keller Declaration at 2, ¶ 6, Docket No. 11.

[16]Declaration of Christine Coleman [etc.] at 1, ¶ 3, Exhibit A, Notice of Errata [etc.], Docket No. 30.

[17]Id. at ¶ 7.

"Generally, 'the [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Portland General Electric Company v. Liberty Mutual Insurance Company, 862 F.3d 981, 985 (9th Cir. 2017) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983)). "Certain issues, however, are presumptively reserved for the court." Id. "These include 'gateway' questions of arbitrability, such as 'whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy.'" Id. (quoting Momot v. Mastro, 652 F.3d 982, 987 (9th Cir. 2011)). "However, parties may delegate the adjudication of gateway issues to the arbitrator if they clearly and unmistakably agree to do so." Id. (citation omitted).

Defendant argues that the parties have clearly and unmistakably agreed to allow the arbitrator to decide gateway issues, such as the existence of a valid arbitration agreement, because the arbitration agreement contains a delegation clause. Specifically, the arbitration agreement provides that "the arbitrator will have the authority to resolve any other Dispute regarding the terms of this agreement, this arbitration clause or Related Documents, including any claim or controversy regarding the arbitrability of any Dispute."[18] "[L]anguage 'delegating to the arbitrators the authority to determine the validity or application of any of

---

[18] 2019 Share Account Disclosure Statement (Member, Joint, Trust, Fiduciary and Estate Accounts), Exhibit 1 at 14, Keller Declaration, Docket No. 11.

the provisions of the arbitration clause[] constitutes an agreement to arbitrate threshold issues concerning the arbitration agreement.'" Mohamed v. Uber Technologies, Inc., 848 F.3d 1201, 1208 (9th Cir. 2016) (quoting Momot, 652 F.3d at 988). The arbitration agreement also incorporates the rules of the American Arbitration Association,[19] which defendant argues is yet another indication that the parties agreed to arbitrate threshold or gateway issues. See Galilea, LLC v. AGCS Marine Insur. Co., 879 F.3d 1052, 1061 (9th Cir. 2018) ("[b]ecause the parties . . . incorporated AAA rules into their arbitration agreement, they have clearly and unmistakably indicated their intent to submit arbitrability questions to an arbitrator"). Thus, defendant argues that it is for the arbitrator, and not the court, to decide whether a valid arbitration agreement exists.

However, "[w]hile the validity of an arbitration clause can be a question for the arbitrator where the 'crux of the complaint is that the contract as a whole (including its arbitration provision)' is invalid, the court determines the validity of the clause where the challenge is 'specifically [to] the validity of the agreement to arbitrate.'" Bridge Fund Capital Corp. v. Fastbucks Franchise Corp., 622 F.3d 996, 1000 (9th Cir. 2010) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 (2006)). Plaintiff is not challenging the validity of the Account Agreement as a whole. She is challenging the existence and validity of the agreement to arbitrate. Plaintiff contends that an agreement to arbitrate was never formed and thus defendant's reliance on the delegation clause and the

---

[19]Id. at 13.

agreement's reference to the AAA rules is misplaced. As one court has observed, "[w]hen one party contends that an agreement to arbitrate was never formed, looking to the text of that very agreement is problematic because the agreement is only a valid indicator of the parties' intent if they agreed to be bound by its terms." Allstate Insurance Co. v. Toll Brothers, Inc., 171 F. Supp. 3d 417, 424 (E.D. Pa. 2016). Here, the "'substantive basis of [plaintiff's] challenge' is to the arbitration provision," and thus "the court resolves the question" of whether a valid arbitration agreement exists. Fagerstrom v. Amazon.com, Inc., 141 F. Supp. 3d 1051, 1060 (S.D. Cal. 2015) (quoting Bridge Fund, 622 F.3d at 1001).

"[A]s the party seeking to compel arbitration," defendant "has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014). "State contract law controls whether the parties have agreed to arbitrate." Id. "[W]hen considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, [the court] should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." Mwithiga v. Uber Technologies, Inc., 376 F. Supp. 3d 1052, 1059 (D. Nev. 2019) (citation omitted).

Defendant argues that the evidence before the court shows that it could change the terms and conditions of accounts "from time to time" without "member approval[,]"[20] which

---

[20]2018 Share Account Disclosure Statement (Member, Joint, Trust, Fiduciary and Estate Accounts), Exhibit 1 at 2, Tropin Declaration, Docket No. 27.

is what it did in February 2019 when it added the arbitration provision to the Account Agreement. Defendant contends that it was not required to provide any notice of this change but that it did so on May 2, 2019, when it added the pop up notice on the UltraBranch login page, which a member was required to close before proceeding to his or her account page. Because the evidence shows that plaintiff navigated to the UltraBranch login page on May 6 and May 8, 2019, defendant argues that she saw the pop up notice, and at a minimum, elected to close it and proceed to her account information. Defendant argues that plaintiff agreed to the arbitration provision by clicking the "close" button on the pop up notice and thereafter maintaining and making use of her account. See West v. Uber Technologies, Case No. 18-CV-3001-PSG-GJS, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) (finding that after a consumer received an email about updated terms, "continued use of the service or product constitutes assent to the updated terms"); Ackerberg v. Citicorp USA, Inc., 898 F. Supp. 2d 1172, 1176 (N.D. Cal. 2012) ("[n]umerous courts have found that continued use or failure to opt out of a card account after the issuer provides a change in terms, including an arbitration agreement, evidences the cardholder's acceptance of those terms").

Defendant is correct that the Account Agreement provided that defendant could make changes without member approval. However, the Account Agreement also provided that defendant was required to provide prior notice of any changes "that would adversely affect"

its members.[21] And, plaintiff argues that the addition of an arbitration provision in the Account Agreement was an adverse change that would require prior notice.

Plaintiff's argument raises a question of contract interpretation. Under Alaska law, "[t]he objective of contract interpretation is to determine and enforce the reasonable expectations of the parties." Norville v. Carr-Gottstein Foods Co., 84 P.3d 996, 1004 (Alaska 2004). "The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties." Id. (citation omitted).

Defendant argues that the concept of an adverse change or adverse impact is derived from federal regulations and that the court can look to these regulatory definitions when interpreting the Account Agreement. See Fox Broadcasting Company v. DISH Network LLC, Case No. CV 12-4529 DMG (SHx), 2015 WL 13655436, at *14 (C.D. Cal. Jan. 12, 2015) ("[w]hile statutory definitions do not definitively govern the interpretation of terms in a private agreement, the meaning of a term within an applicable body of law can guide a court in determining a contract term's unambiguous meaning"). The regulations implementing the Truth in Savings Act provide that "[a] credit union shall give advance notice to affected members of any change in a term required to be disclosed under § 707.4(b)[.]" 12 C.F.R. § 707.5(a)(1). Section 707.4(b) requires disclosure of rate information, compounding

---

[21]2018 Share Account Disclosure Statement (Member, Joint, Trust, Fiduciary and Estate Accounts), Exhibit 1 at 2, Tropin Declaration, Docket No. 27.

and crediting, balance information, fees, transaction limitations, features of term share accounts, bonuses, and nature of dividends. Regulation CC requires a credit union to provide members with 30 days notice of any change to its availability of deposited funds policy. 12 C.F.R. § 229.18(e). And, the regulations implementing the Electronic Fund Transfer Act provide that written notice must be provided 21 days in advance of changes involving increased fees for transfers, increased liability for the consumer, fewer types of available electronic fund transfers, and stricter limitations on the frequency or dollar amount of transfers. 12 C.F.R. § 1005.8(a)(1). Defendant argues that these regulations all indicate that an adverse change refers to a negative <u>financial</u> impact. In other words, defendant argues that "a change adversely affecting a member" should be interpreted to mean any change that would have a financial impact on a member. And, according to defendant, the addition of an arbitration provision is not a change that has a financial impact on a member. Moreover, defendant argues that the only evidence that the addition of an arbitration provision was an adverse change is plaintiff's subjective belief. Defendant contends that the arbitration provision benefits members as it provides for a less expensive legal forum, more flexibility for resolving disputes, and the opportunity for a speedier resolution.

Nothing in the Account Agreement indicates that the parties only intended adverse changes to include those that would have a financial impact. There is nothing to indicate that

the parties did not intend "adverse" to be given its ordinary meaning of "unfavorable."[22] And, the addition of a mandatory arbitration provision, which included a class action waiver, could certainly be considered an unfavorable change. As plaintiff points out, there is "a thorough government study" which "confirms how effective is compulsory consumer arbitration in stifling consumer claims altogether." United States v. Aegerion Pharmaceuticals, Inc., 280 F. Supp. 3d 217, 226 n.7 (D. Mass. 2017) (citing Arbitration Study Report to Congress, pursuant to Dodd–Frank Wall Street Reform and Consumer Protection Act § 1028(a), Consumer Financial Protection Bureau (March 2015)). Gardner's testimony to the contrary, that the arbitration provision was "an improvement" for members,[23] is unconvincing. The court concludes that the addition of the arbitration provision was an adverse change which required prior notice to defendant's members.

It is undisputed that no notice was given to defendant's members prior to the arbitration provision being added to the Account Agreement. Gardner testified that "[n]o formal notice was provided prior to the implementation" of the arbitration provision,[24] and plaintiff avers that she "was not given advance notice of the arbitration agreement and class action waiver. . . ."[25] Because defendant "did not comply with the contract's specified

---

[22]https://www.merriam-webster.com/dictionary/adverse (last visited January 8, 2020).

[23]Gardner Deposition at 56:4-12, Exhibit 2, Tropin Declaration, Docket No. 27.

[24]Id. at 26:5-10.

[25]Coleman Declaration at 1, ¶ 6, Notice of Errata, Docket No. 30.

-12-

method for modification," "the arbitration provision[] never became part of the contract between" plaintiff and defendant. Barnett v. Cigna Health Plan of Ariz., Case No. 02–16460, 2003 WL 21750808, at *1 (9th Cir. July 25, 2003). And, if the arbitration provision never became part of the Account Agreement, then defendant's motion to compel arbitration must be denied.

But even if the change made to the Account Agreement in February 2019 was not an adverse change for which defendant was required to provide prior notice to its members, defendant's motion to compel arbitration would still have to be denied. "'[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Knutson, 771 F.3d at 565 (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960). "'Mutual assent is an elementary requirement for a binding contract.'" Young v. Hobbs, 916 P.2d 485, 488 (Alaska 1996) (quoting Zeman v. Lufthansa German Airlines, 699 P.2d 1274, 1281 (Alaska 1985)). In order for plaintiff to have been bound by the terms of the arbitration agreement, there must be some evidence that shows "that a reasonably prudent user would have been on inquiry notice that [an arbitration] agreement existed." Knutson, 771 F.3d at 569. "While failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1179 (9th Cir. 2014) (internal citation omitted). As the Seventh Circuit has explained, "we cannot presume that a person

who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." Sgouros v. TransUnion Corp., 817 F.3d 1029, 1035 (7th Cir. 2016). Here, defendant's pop notice made no mention of the specific changes being made to the Account Agreement. The notice failed to describe the update or call attention to the new arbitration provision. Such notice is insufficient to put a member on inquiry notice that an arbitration agreement was being added to its contract with defendant. Requiring such notice is not "[a]n arbitration-specific rule [that] would be preempted by the FAA," O'Connor v. Uber Technologies, Inc., 904 F.3d 1087, 1093 (9th Cir. 2018), as defendant argues. It is a necessary requirement for a binding contract.

## Conclusion

Defendant's motion to compel arbitration is denied. Defendant shall answer or otherwise respond to plaintiff's complaint on or before January 28, 2020.

DATED at Anchorage, Alaska, this 9th day of January, 2020.

/s/ H. Russel Holland
United States District Judge